Filed 9/29/15  P. v. Reynolds CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JERRY EUGENE REYNOLDS,<br><br>  Defendant and Appellant. | G048622<br><br>(Super. Ct. No. INF039323)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, James S. Hawkins, Judge.  Affirmed as modified.

Ron Boyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Jerry Eugene Reynolds, Jesse Dean Nava, Michael Marohn, and Mario Gonzalez were charged with Bernardo Gouthier's murder. Gonzalez was tried separately and convicted of first degree murder. Marohn cooperated with law enforcement and received a determinate sentence of 20 years four months.

This is defendant Jerry Eugene Reynolds's second appeal in this matter. In the first appeal, we reversed his and Nava's convictions for first degree murder due to *Batson*/*Wheeler* error.[1] (*People v. Reynolds* (July 16, 2009, G040063) [nonpub. opn.].) On remand, defendant and Nava were acquitted of first degree murder and convicted of second degree murder as a lesser included offense.[2] While conceding the evidence would have been sufficient to support a conviction for first degree murder had he been so convicted, defendant contends the evidence does not support his conviction for second degree murder.

He also urges his conviction should be reversed based on prosecutorial misconduct during argument, and that he is entitled to additional days credit against his sentence. The Attorney General concedes the court erred in failing to award presentence conduct credits. We agree and will order the abstract of judgment amended to reflect the correct presentence credits. We otherwise affirm the judgment.

I

PROCEDURAL SETTING AND FACTS

Defendant and Nava were charged in the second amended information with the murder of Gouthier on October 25, 1977, in Riverside County. (Pen. Code, § 187, subd. (a); all undesignated statutory references are to the Penal Code.) The murder was alleged to have been committed for financial gain (§ 190.2, subd. (a)(1)), Nava was

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

[2] Nava is not a party to this appeal.

2

alleged to have personally used a firearm in the commission of the murder (§ 12022.5, former subd. (a)(1)), and defendant was charged with two vicariously armed allegations (§ 12022, subd. (d)).

Defendant and Nava represented themselves at trial. The jury found both not guilty of first degree murder and guilty of second degree murder as a lesser included offense of first degree murder. The jury also found true the allegation defendant had been vicariously armed with a .357-caliber handgun and found the second section 12022, subdivision (d) enhancement not true in connection with a .25-caliber handgun. The court sentenced defendant to 15 years to life on the second degree murder and a consecutive three-year upper term for armed enhancement. The court directed the probation department to calculate defendant's custody credits. The probation department calculated defendant's actual time in custody and claimed defendant was not entitled to any conduct credits pursuant to section 2933.2, subdivision (a). The court entered an order reflecting an award of credits as calculated. Defendant filed a timely notice of appeal.

Pattison Hayton considered himself an investment banker. He had offices in Rhode Island, La Quinta, and Vancouver, Canada. He married Kathy Barr in 1988. They lived in PGA West in La Quinta. He traveled a lot for business and to play polo. Barr said she only saw Hayton five to 10 days a month.

In 1995, three months after her son was born, Barr began an affair with Bernardo Gouthier. Gouthier was an art dealer. He lived near Hayton and Barr on a 20-acre sculpture park with a main house and two pools in PGA West.

Hayton found out about Barr and Gouthier's relationship. In December 1996, Hayton telephoned Gouthier, put Barr on the telephone with Gouthier, and told her to tell Gouthier to leave her alone. She did and then Hayton got on the phone with Gouthier. Hayton told Gouthier to leave Barr alone "or you'll be dead."

3

Barr and Hayton separated in January 1997. Barr moved in with Gouthier part time around March 1997, and permanently in September 1997. Dissolution proceedings were "ugly." Hayton did not pay the court-ordered child support. Neither did he pay the court-ordered spousal support. After appearing at a hearing in the dissolution matter, Barr went to the family residence at PGA West to remove the remainder of her belongs. She showed up with Gouthier's truck and his best friend. Hayton got angry, asking the male whether he worked for "that effing [Gouthier]." Hayton also became violent. As Barr was leaving the house carrying their baby, a diaper bag, and a painting of Gouthier's, Hayton grabbed the painting from her, put his foot through it, and threw it at Barr, telling her to give it back to her "effing boyfriend." He pushed Barr and "slamm[ed]" her into metal doors. Barr called the police and Hayton was arrested. As Hayton was being taken away by police, his personal assistant asked, "What happens now . . . ?" Hayton told her to contact defendant. She did and defendant helped Hayton post bail.

On another occasion Barr went to a mediation hearing and parked her car in front of the building where the meeting was to be held. When she returned, her car was gone. The police found it in the desert. It had been "torched."

Also during the dissolution proceedings, the office of Barr's divorce attorney was the subject of arson. Barr's attorney told arson investigators he suspected Hayton or someone on his behalf was behind it, given Barr's vehicle had been burned and Gouthier's "brand-new" pickup truck had been "torched and burned in his driveway." Michael Marohn and his father burned the attorney's office at defendant's direction.

On October 23, 1997, Hayton learned Barr and his children were living with Gouthier. The court handling the dissolution matter ordered Barr to provide Hayton, in writing, the address where she and the children were living. Hayton became "absolutely furious" when he was given the information. According to Hayton, they were living "in [his] f…ing backyard." Gouthier's residence was at the back gate of the

4

community where Hayton lived.  That day, Hayton stayed in his office with the door shut the rest of the day after getting the news.  He did not let anyone in his office and he refused to take any calls.  Hayton's assistant said she does not know if Hayton used Gouthier's name that day, but he "used a lot of 'f…ing whore.'"  That same day, a check for $1,000 was made out to defendant from one of Hayton's companies.

On October 25, 1997, the last day of Gouthier's life, Barr spent the day with him.  That evening she went to Palm Desert to have dinner with a couple of girlfriends.  The children were with their father, Hayton.

Barr attempted to call Gouthier when she left the restaurant, but he did not answer.  She kept calling from the car, but there was no answer.  When she got home, she noticed all the lights were on inside the house and the front door was wide open.  Both were unusual.  Barr entered and could smell Gouthier's cologne.  She called out for him but he did not answer.  After Barr looked through the whole house and could not find Gouthier, she called his best friend Willard and asked if he had heard from Gouthier.  Willard told Barr to get out of the house.

Barr drove across the street to the caretakers' house.  The caretakers found Gouthier.  He had been shot four times and was dead.  Once Barr learned what happened to Gouthier and the police finally arrived and spoke with her, she said, "I know who did this.  My husband's behind this.  I don't think he did it, but he had someone do it, and he has an alibi, and he has my kids."

Police went to Hayton's residence in PGA West the next morning and saw him talking to someone next to a Maple Leaf Plumbing truck assigned to defendant by Maple Leaf.  The security log for PGA West stated the truck entered PGA West at 8:50 a.m. with the stated purpose of going to Hayton's address.  Maple Leaf records indicate defendant was not on company business at the time.

That same morning, October 26, 1997, defendant telephoned his personal assistant.  He told her the police said Gouthier had been killed and the police suspect it

5

was "a hit." The assistant knew who Hayton was talking about. She said everyone in the officer knew Gouthier was Barr's boyfriend. Hayton told his assistant he needed her to come to his house right away. She arrived at his residence around 12:00 p.m. or 1:00 p.m. He was upset she had taken so long.

When she arrived, the assistant saw the children, the nanny, and enough packed luggage to last a year. Hayton called her into his home office and said there were things he needed her to do. She said Hayton was rambling, not making sense, and at one point started crying. Hayton left town without telling his assistant where he was going. Although the assistant did not know where he went, she kept in contact with him. This was unusual for Hayton. He had never before taken off for weeks at a time. His assistant asked him why. He said it was because he was afraid and was protecting his children.

Some time after the shooting, the assistant met with Hayton in his Rhode Island office. One day in early November 1997, defendant angrily stormed into the Rhode Island office between 10:00 a.m. and noon. The assistant called Hayton, who was in a meeting with executives. Hayton told the executives to wait and he left the meeting to meet with defendant for about 30 to 40 minutes. Leaving executives waiting like that was unusual for Hayton. Defendant calmed down after meeting with Hayton. After that meeting, Hayton then told his assistant to book a return flight to California for defendant.

Later that month, a law firm that handled certain matters for Hayton disbursed $10,000 to defendant at Hayton's direction. Defendant was also given 100,000 shares of stock in one of Hayton's companies. The next day, defendant opened an account with Merrill Lynch. Defendant deposited the 100,000 shares of stock, worth $35,000, into the account. On November 10, 1997, $5,000 was wired into defendant's account from one of Hayton's companies.

Marohn was 17 years old in 1997. He was a gang member and a drug user. Marohn testified for the prosecution in exchange for a sentence of 20 years four months for manslaughter, a number of burglaries, and arson.

6

Marohn said defendant paid him and Nava to kill someone in La Quinta at "[t]he Sculpture Park," in October 1997. Defendant offered Marohn $5,000 to do the killing. Defendant told Marohn the subject to be killed lived at the sculpture park with a woman, and told Marohn when the woman would be away from the sculpture park, leaving the subject alone at the house. Marohn may have learned the day before the killing that Gouthier would be alone at the house that night. Defendant gave Marohn a .357-caliber firearm and told him to use it. He also gave Marohn a Taser and zip ties, leading Marohn to believe defendant wanted him to "incapacitate . . . Gouthier, shock him, zip tie him, and shoot him." Defendant told Marohn there would be cocaine in Gouthier's house. Gonzalez went along with Marohn and Nava to find the cocaine. Marohn did not tell Gonzalez that Gouthier would be killed.

Prior to the killing, Marohn borrowed a smaller caliber pistol from Gonzalez. The plan was for Marohn to Taser Gouthier, tie him up, and then Nava would shoot Gouthier. Nava had a .25-caliber firearm. They parked across the street from Gouthier's residence, climbed the fence surrounding the property, and walked through the property to the residence. Marohn tried the doorknob and found the door was not locked. They found Gouthier inside a bedroom. Marohn told Gouthier to get on the ground. Gouthier complied. Marohn tasered Gouthier, who then jumped up, and Marohn yelled, "Shoot, shoot." Nava fired four or more shots and Gouthier crashed through "a window." Gonzalez, Nava, and Marohn ran away after Gouthier went through the bedroom window.

II

DISCUSSION

A. *The Evidence Supports the Murder Verdict*

As a general rule, "'[w]hen considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence

7

that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) "[M]alice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) The crime of murder is divided into degrees. Murder is of the first degree if the unlawful killing was deliberate and premeditated, or it the killing occurred during the commission of one or more of the offenses listed in section 189. All other murder is of the second degree. (§ 189.) In other words, "[s]econd degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) Second degree murder is a lesser included offense of a deliberate and premeditated murder. (See *People v. Elliot* (2005) 37 Cal.4th 453, 475 [failure to instruct on lesser included offense of second degree murder was harmless based on facts of case].)

The evidence supports defendant's conviction. Because defendant was not present when Gouthier was murdered, his liability must be based on an aiding and abetting theory. One who aids and abets a principal's commission of a crime shares the guilt of the actual perpetrator. (§ 31.) "[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or

8

purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)  In arranging for Gouthier to be killed by Marohn and Nava, defendant necessarily knew of their intent to kill Gouthier.  He encouraged them to commit the murder and, by letting them know when Gouthier would be home alone and by supplying a firearm to use in the murder, together with a Taser and zip ties to bind Gouthier, defendant aided, promoted, encouraged and instigated the murder.

Defendant concedes this evidence would support a conviction for first degree murder.  He argues, however, we cannot consider this evidence because (1) the evidence is of a deliberate and premeditated murder (a first degree murder), not a murder without deliberation and premeditation (a second degree murder), and (2) the jury necessarily rejected this evidence when it acquitted him of first degree murder.  We disagree.

We do not know why the jury acquitted defendant and Nava of first degree murder.  For all we know, the jury concluded a conviction for first degree murder with the attached special circumstance allegation was too onerous and decided to show mercy to defendant and Nava, an act a jury has the power, but not the right to do.  (*People v. Engelman* (2002) 28 Cal.4th 436, 441.)  A jury has the "'undisputed power' to acquit regardless of the evidence." (*People v. Baca* (1996) 48 Cal.App.4th 1703, 1707.)  What we do know is that after hearing all the evidence, the jury found defendant aided and abetted the murder of Gouthier, and the only evidence of defendant's aiding and abetting is the evidence we referred to above.  Consequently, we cannot conclude the jury rejected that evidence, defendant's acquittal of the first degree murder charge notwithstanding.

9

B. *Prosecutorial Misconduct*

"'""'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, . . . '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citation.] To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]" [Citation.] A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm.' (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)" (*People v. Adams* (2014) 60 Cal.4th 541, 568-569.) We review de novo whether misconduct resulted in a constitutional violation. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1403.)

Defendant claims the prosecutor committed prejudicial misconduct while arguing to the jury. He first points to the prosecutor calling him "greedy," "oily," "slimy," and "unctuous." The prosecutor started out his argument by stating, "We're here because greedy men killed Bernardo Gouthier at the behest of an angry, immature, controlling jealous, rich man." Defendant did not object to this initial statement. Consequently, defendant forfeited the issue for appeal. (*People v. Adams*, *supra*, 60 Cal.4th at pp. 568-569.)

Defendant objected to being referred as unctuous, once the prosecutor explained the word meant oily or slimy. The objection was overruled. We conclude the prosecutor's use of the word *unctuous* did not deny defendant due process. "A

10

prosecutor may argue vigorously and include opprobrious epithets and forceful language when warranted by the evidence. [Citations.]" (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1074.) "We have observed that a prosecutor is not 'required to discuss his [or her] view of the case in clinical or detached detail.' [Citation.] '[T]he use of derogatory epithets to describe a defendant is not necessarily misconduct.' (*People v. Friend* (2009) 47 Cal.4th 1, 32 [defendant described as '"living like a mole or the rat that he is"'].) 'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 1021; see *People v. Edelbacher* (1989) 47 Cal.3d 983, 1030 [prosecutor's reference to defendant as a "snake in the jungle," "slick," was not misconduct].) We conclude the prosecutor's reference to defendant as unctuous was a fleeting characterization, given the relative length of his argument, and did not amount to misconduct. (*People v. Tully*, *supra*, 54 Cal.4th at p. 1021.)

Later, during his closing argument, the prosecutor again called defendant unctuous, stating, "You got to decide if you are going to have this unctuous man, this opportunist, this manipulator, this societal parasite, if you are going to hold him responsible for his use of other people, all to get himself a little bit of money. [¶] [Defendant] would probably kill his own mother to get money. He's that kind of guy. [¶] [Defendant] would exploit three young thugs who were on a certain path in life to be the muscle to get this stuff done for him, all without dirtying his own hands." Again, given the facts of this case, we find the description of defendant did not rise to the level of misconduct.

Additionally, defendant did not object to the prosecutor's statement. He claims he should be excused for not objecting because any such objection would have been useless given the court overruled his prior objection to having been called unctuous. Defendant's complaint about to the present prosecutor's statement, however, is not that

11

he was referred to as slimy or oily, but rather that the prosecutor argued he was the "kind of guy" who would murder his mother for money and that such an argument is improper. The court's prior decision overruling defendant's objection to being called unctuous does not excuse defendant's failure to object to the prosecutor's "kind of guy" argument. His failure to object forfeited the issue.

Next, defendant argues the following argument by the prosecutor was improper because it asked the jury to consider the impact of the crime of the victim. "You know, when you kill a man, you take the remainder, right, you steal whatever's left. And this was a young man, 43 years old. He would have had the 15 years that have elapsed since then and probably another 15 or 20 after that. It was a man who had a dream of developing this unique property into an art school. And all of that was stolen from him by Mr. Nava, so Mr. Nava could get roughly $10 grand and a couple of cars if he ever got fully paid from our go-between in this case." The prosecutor went on to urge the jury to give justice to Gouthier and the people of La Quinta, as well as Nava and defendant. While it is improper to argue sympathy for the victim in determining the guilt of a defendant (*People v. Fields* (1983) 35 Cal.3d 329, 362), defendant again failed to preserve the issue by objecting to the prosecutor's statement. We also note the argument was made in connection with the issue of *Nava's* guilt. In addition, because the jury acquitted defendant of the charged first degree murder, a crime defendant concedes was supported by substantial evidence, it does not appear the comment prejudiced defendant.

C. *The Weapon Enhancement*

In supplemental briefing, the parties addressed the issue of whether the court imposed an inapplicable firearm enhancement. The parties agree the court did.

The information charged defendant with an enhancement for being armed with a firearm in the commission of the murder. The allegation, however, claimed the statute violated by defendant's conduct was section 12022, subdivision (d). The jury

12

found the enhancement true.  The problem is that while there was substantial evidence defendant was "armed" with a firearm in the course of the murder, as conceded by defendant, subdivision (d) of section 12022 has no application in this case.  At the time of defendant's offense, the statute provided:  "Notwithstanding the enhancement set forth in subdivision (a), any person who is not personally armed with a firearm who, knowing that another principal is personally armed with a firearm, is a principal in the commission *of an offense or attempted offense specified in subdivision (c)*, shall be punished by an additional and consecutive term of imprisonment in the state prison for one, two, or three years."  (Former § 12022, subd. (d); Stats. 2004, ch. 494, § 3, repealed Stats. 2010, ch. 711, § 4, eff. Jan. 1, 2011, italics added.)  The offenses listed in subdivision (c) of section 12022 are drug offenses set forth in certain Health and Safety Code sections.  Defendant was not charged with a Health and Safety Code violation.

The appropriate arming enhancement in this case was subdivision (a)(1) of section 12022.  That subdivision provided:  "Except as provided in subdivisions (c) and (d), any person who is armed with a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless the arming is an element of that offense. . . ."  (Former § 12022, subd. (a)(1); Stats. 2004, ch. 494, § 3, repealed Stats. 2010, ch. 711, § 4, eff. Jan. 1, 2011.)  The jury was instructed in terms of section 12022, subdivision (a)(1), not subdivision (d).

The parties each agree the appropriate action here is to strike the three-year enhancement purportedly imposed pursuant section 12022, subdivision (d) and to correct the abstract of judgment to reflect the imposition of a one-year enhancement pursuant to section 12022, subdivision (a)(1) in its stead.  Because the jury was instructed in the terms of the appropriate arming enhancement, they found he was armed within the meaning of the section 12022, and the evidence supports such a finding, this is the appropriate remedy.  (*People v. Strickland* (1974) 11 Cal.3d 946, 961; *People v. Fialho*

13

(2014) 229 Cal.App.4th 1389, 1398-1399.) We therefore order the abstract of judgment modified to reflect the imposition of a one-year enhancement pursuant to section 12022, subdivision (a)(1), and strike from the abstract of judgment any reference to section 12022, subdivision (d).

D. *Credits*

The trial court did not calculate defendant's conduct credits and instead, referred the matter to the probation department to calculate defendant's presentence conduct credits. The abstract of judgment indicates defendant was awarded 4,231 days for actual time in custody prior to sentencing. No conduct credits were awarded. Although section 2933.2 prohibits the awarding of presentence conduct credits under section 4019 to one subsequently convicted of murder (§ 2933.2, subd. (c)), subdivision (d) of the same statute limits its application: "This section shall only apply to murder that is committed on or after the date on which this section becomes operative." (§ 2933.2, subd. (d).) The effective provision did not go into effect until June 3, 1998. (*People v. Chism* (2014) 58 Cal.4th 1266, 1336.) The murder in this matter occurred in 1997, prior to the effective date of section 2933.2.

The Attorney General concedes the court erred in not awarding defendant presentence conduct credits and asks us to order the abstract of judgment corrected to reflect 534 days of presentence conduct credits. Defendant agrees with the calculation. We will therefore order the abstract amended to reflect an award of 534 days presentence conduct credits pursuant to section 4019.

III

DISPOSITION

The imposition of a three-year enhancement pursuant to section 12022, subdivision (d) is stricken. The abstract of judgment is ordered corrected: (1) to reflect the imposition of a one-year enhancement pursuant to section 12022, subdivision (a)(1)

14

in its stead, and (2) to reflect an award of 534 days of presentence conduct credits in addition to the credits awarded for actual time.  The judgment is otherwise affirmed.


                                        MOORE, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.